1  SANDRA R. BROWN
   Acting United States Attorney
2  DOROTHY A. SCHOUTEN
   Assistant United States Attorney
3  Chief, Civil Division
   ROBYN-MARIE LYON MONTELEONE
4  Assistant United States Attorney
   Chief, General Civil Section
5  GARRETT COYLE (CA Bar No. 308177)
   Assistant United States Attorney
6        Federal Building, Suite 7516
         300 North Los Angeles Street
7        Los Angeles, California 90012
         Telephone: (213) 894-6167
8        Facsimile: (213) 894-7819
         E-mail: garrett.coyle@usdoj.gov
9
   Attorneys for Petitioner United States of America
10
                 UNITED STATES DISTRICT COURT
11
          FOR THE CENTRAL DISTRICT OF CALIFORNIA
12
   **United States of America**,            No. 17-cv-3326
13
                          Petitioner,    **Petition to Enforce Administrative
14                                       Subpoenas Issued by U.S. Chemical
                 – v. –                  Safety and Hazard Investigation Board**
15
   **Exxon Mobil Oil Corporation**,
16
                          Respondent.
17

18

19

20

21

22

23

24

25

26

27

28

                              1

**Table of Contents**

I. Preliminary Statement ...........................................................................................1

II. Parties..................................................................................................................1

III. Jurisdiction and Venue .......................................................................................1

IV. Standards for Judicial Enforcement of Administrative Subpoenas........................1

V. General Allegations .............................................................................................2

    A. The U.S. Chemical Safety and Hazard Investigation Board........................2

    B. The mechanics of oil refineries .................................................................4

    C. The February 2015 explosion at Exxon's Torrance refinery .......................6

    D. The fire in the platinum reformer unit in March 2015 ................................8

    E. The modified hydrofluoric acid leak in September 2015 ............................8

    F. The Board opens an investigation ..............................................................8

    G. The Board's subpoenas and Exxon's failure to comply fully.....................8

        1. The June 2015 subpoena ....................................................................9

        2. The July 2015 subpoena......................................................................9

        3. The two August 2015 subpoenas .......................................................10

        4. The September 2015 subpoena ...........................................................19

        5. The October 2015 subpoena ..............................................................23

    H. Efforts to seek compliance and obtain the required information ...............27

VI. Cause of Action ................................................................................................27

VII. Relief Requested...............................................................................................28

Appendix of Relevant Statutes...................................................................................1a

1

Petitioner United States of America states as follows:

**I.    Preliminary Statement**

1.    This proceeding seeks an order compelling respondent Exxon Mobil Oil Corporation (Exxon) to comply with administrative subpoenas issued and properly served by the U.S. Chemical Safety and Hazard Investigation Board (the Board) as part of its investigation into an explosion at Exxon's oil refinery in Torrance, California in February 2015.

**II.   Parties**

2.    Petitioner is the United States of America.

3.    Respondent Exxon Mobil Oil Corporation is a New Jersey corporation doing business within the state of California.

**III.  Jurisdiction and Venue**

4.    This petition is made under the Clean Air Act amendments of 1990, 42 U.S.C. §§ 7607(a) and 7412(r)(6)(M).

5.    This Court has jurisdiction under 42 U.S.C. § 7607(a) and 28 U.S.C. § 1345.

6.    Venue is proper in this Court under 28 U.S.C. § 1391(b).

**IV.   Standards for Judicial Enforcement of Administrative Subpoenas**

7.    The scope of judicial inquiry in an administrative subpoena enforcement proceeding is "quite narrow." *E.E.O.C. v. Fed. Express Corp.*, 558 F.3d 842, 848 (9th Cir. 2009). Courts will grant a petition to enforce agency subpoenas as long as: (1) Congress has granted the authority to investigate; (2) procedural requirements have been followed; and (3) the evidence is relevant and material to the investigation. *Id.*

8.    When an administrative subpoena is challenged as being beyond the agency's jurisdiction, the inquiry is "'strictly limited.'" *Id.* "'As long as the evidence is relevant, material and there is some 'plausible' ground for jurisdiction, or, to phrase it another way, unless jurisdiction is 'plainly lacking,' the court should enforce the subpoena." *Id.* The rationale for this deferential standard is that "'judicial review of early

1

phases of an administrative inquiry results in interference with the proper functioning of the agency and delays resolution of the ultimate question whether the [law] was violated.'" *Id.*; *United States v. Morton Salt Co.*, 338 U.S. 632, 642–43 (1950) (an agency "can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not").

9.     The relevance requirement is "not especially constraining" and "is determined in terms of the investigation rather than in terms of evidentiary relevance." *Fed. Express Corp.*, 558 F.3d at 854.

## V.     General Allegations

### A.     The U.S. Chemical Safety and Hazard Investigation Board

10.     The U.S. Chemical Safety and Hazard Investigation Board is an independent agency charged with investigating accidental major releases of hazardous air pollutants and recommending measures to improve chemical safety. 42 U.S.C. § 7412(r)(6)(C). The Board is a non-regulatory agency and cannot issue fines or citations. Instead, the Board's mission is to advocate for improved protection of workers, the public, and the environment. 42 U.S.C. § 7412(r)(6)(C)(ii).

11.     The Board's authorizing statute directs the Board to:

a.     "investigate (or cause to be investigated), determine and report to the public in writing the facts, conditions, and circumstances and the cause or probable cause of any accidental release resulting in a fatality, serious injury or substantial property damages;" and

b.     "issue periodic reports … recommending measures to reduce the likelihood or the consequences of accidental releases and proposing corrective steps to make chemical production, processing, handling and storage as safe and free from risk of injury as is possible and may include in such reports proposed rules or orders which should be issued by the [U.S. Environmental Protection Agency] … or the Secretary of Labor … to prevent or minimize the consequences of

1       any release of substances that may cause death, injury or other

2       serious adverse effects on human health or substantial property

3       damage as the result of an accidental release ….” 42 U.S.C.

4       § 7412(r)(6)(C).

5       12.    In addition, the Board’s authorizing statute says that “[i]n no event shall the

6   Board forego an investigation where an accidental release causes a fatality or serious

7   injury among the general public, or had the potential to cause substantial property

8   damage or a number of deaths or injuries among the general public.” 42 U.S.C.

9   § 7412(r)(6)(E).

10       13.    To carry out these duties, the Board may:

11       a.    “hold such hearings, sit and act at such times and places, administer

12       such oaths, and require by subpoena or otherwise attendance and

13       testimony of such witnesses and the production of evidence and may

14       require by order that any person engaged in the production,

15       processing, handling, or storage of extremely hazardous substances

16       submit written reports and responses to requests and questions within

17       such time and in such form as the Board may require;” and

18       b.    “upon presenting appropriate credentials and a written notice of

19       inspection authority, enter any property where an accidental release

20       causing a fatality, serious injury or substantial property damage has

21       occurred and do all things therein necessary for a proper

22       investigation … and inspect at reasonable times records, files, papers,

23       processes, controls, and facilities and take such samples as are

24       relevant to such investigation.” 42 U.S.C. § 7412(r)(6)(L).

25       14.    In addition to these information gathering tools, the Board also “may use

26   any information gathering authority of the [U.S. Environmental Protection Agency]

27   under this chapter, including the subpoena power provided in [42 U.S.C. § 7607(a)(1)].”

28   42 U.S.C. § 7412(r)(6)(M). The subpoena power in 42 U.S.C. § 7607(a)(1) allows the

Board to "issue subpoenas for the attendance and testimony of witnesses and the production of relevant papers, books, and documents." 42 U.S.C. § 7607(a).

15.     Information obtained by the Board is generally available to the public. 42 U.S.C. § 7412(r)(6)(Q). However, "upon a showing satisfactory to the Board by any person that records, reports, or information, or particular part thereof (other than release or emissions data) to which the Board has access, if made public, is likely to cause substantial harm to the person's competitive position, the Board shall consider such record, report, or information or particular portion thereof confidential …." 42 U.S.C. § 7412(r)(6)(Q).

**B.     The mechanics of oil refineries**

16.     Oil refineries use heat and chemical reactions to convert crude oil into useful fuels. Crude oil is a mix of different chemical compounds, or "cuts," like propane, butane, kerosene, and heavy gas oil. To separate these different cuts, the crude oil is heated to high temperatures, causing the less dense cuts to rise to the top. Once the different cuts are separated, they are sent to different units of the refinery for chemical processing into useful fuels.

17.     A cut called heavy gas oil is sent to the ***fluid catalytic cracking unit*** (or FCC unit). In the fluid catalytic cracking unit, heavy gas oil is heated in a reactor and mixed with a catalyst (a sand-like solid that flows like a fluid) to break (or "crack") the heavy gas oil into lighter, more useful fuels like gasoline. These lighter fuels rise to the top of the reactor and are piped to the adjacent main column for further separation and processing:



18.     The chemical reaction in the reactor causes a solid carbon material called coke to accumulate on the surface of the catalyst, making the catalyst less effective (called "spent" catalyst). To restore the effectiveness of the spent catalyst, it is piped from the reactor into the adjacent regenerator, where an air blower heats it to 1300°F to burn off the coke. The regenerated catalyst is then piped back into the reactor.

19.     Normally, catalyst at the bottom of the reactor operates as a barrier preventing flammable fuels at the top of the reactor from flowing into the regenerator or other equipment, where they could ignite. Slide valves between the reactor and regenerator keep enough catalyst in the bottom of the regenerator to prevent flammable fuels from escaping out of the reactor and igniting.

20.     The process of burning off carbon from catalyst in the regenerator creates hot exhaust containing pollutants. The exhaust is piped through a turbine called an ***expander*** (or 2K1 expander) to cool it and capture energy. The energy captured by the turbine is used to power the regenerator.

21.     Once the exhaust has been cooled, it is piped to a large filtration device

called the **electrostatic precipitator** (or ESP) that uses high-voltage electric charges to remove pollution. Instruments between the expander turbine and the electrostatic precipitator monitor the exhaust to detect for carbon monoxide, which could explode in the electrostatic precipitator. If carbon monoxide is detected, the exhaust is diverted through a carbon monoxide boiler (or CO boiler) to burn off the carbon monoxide before reaching the electrostatic precipitator. After the electrostatic precipitator removes pollutants from the exhaust, the exhaust is released into the ambient air.

22.    Some fuels from the main column of the fluid catalytic cracking unit are piped to the adjacent **alkylation unit** to be processed into alkylate, a high-octane stock that can be blended with gasoline to raise its octane level. In the alkylation unit, the fuels are mixed with an acid catalyst — often a form of hydrofluoric acid — to yield alkylate.

23.    Other fuels from the main column of the fluid catalytic cracking unit are piped to the adjacent **platinum reformer unit** (or PTR unit) to increase its octane so it can be blended with gasoline.

### C.    The February 2015 explosion at Exxon's Torrance refinery

24.    Exxon owned and operated an oil refinery in Torrance, California at all times relevant to this petition.

25.    On February 18, 2015, a large explosion occurred at Exxon's Torrance refinery. The incident involved the accidental release of regulated substances and extremely hazardous substances — in particular, flammable hydrocarbons — into the ambient air. The incident injured multiple workers and caused substantial property damage.

26.    The explosion occurred in the fluid catalytic cracking unit. The Board believes it originated when particulate matter from exhaust built up unevenly on the blades of the expander turbine. The imbalance caused the turbine to shut down.

27.    When the turbine shuts down, it stops providing power to the regenerator's air blower. When the regenerator's air blower is not powered, it stops sending regenerated catalyst back into the reactor. If nothing is done, all of the catalyst at the

bottom of the reactor will drain into the regenerator, potentially allowing flammable fuels in the reactor to flow into the regenerator and then the ambient air.

28.     To prevent flammable fuels in the reactor from flowing into the regenerator, when the turbine shuts down, it automatically shuts the slide valves between the reactor and the regenerator. However, the slide valves at Exxon's Torrance refinery had not been replaced in years. Constant contact with the abrasive sand-like catalyst had eroded the slide valves so much that they did not completely close the valve between the reactor and the regenerator. As a result, all of the catalyst in the reactor flowed into the regenerator within about seven minutes.

29.     Without the catalyst barrier or sealed slide valves between the reactor and regenerator, flammable fuels in the main column flowed into the reactor, then the regenerator, and then the electrostatic precipitator, where they ignited.

30.     The explosion shook the surrounding areas with the force equivalent to a 1.7 magnitude earthquake, tore a hole in the side of the electrostatic precipitator, and sent ash filled with metals, fiberglass, and glass wool into nearby neighborhoods.

31.     The explosion also catapulted a piece of debris from the electrostatic precipitator weighing about 40 tons into the air. It flew over 100 feet and landed in the adjacent alkylation unit within five feet of a tank filled with thousands of gallons of modified hydrofluoric acid.

32.     Hydrofluoric acid (known as hydrogen fluoride when not dissolved in water) is a toxic contact poison and a highly corrosive liquid that dissolves glass. Breathing it can damage lung tissue and cause fluid accumulation in the lungs. Eye contact can immediately and permanently damage the corneas. Skin contact can cause severe burns, ulcers, systemic toxicity, and ultimately heart attack and death.

33.     Exxon's Torrance refinery does not use pure hydrofluoric acid. In the late 1980s, as part of a consent decree resolving a nuisance suit filed by the City of Torrance, Exxon agreed to use a modified form of hydrofluoric acid. At the time of the consent decree, modified hydrofluoric acid was believed to be safer than pure hydrofluoric acid

because it was less likely to vaporize and become airborne. However, modified hydrofluoric acid is not widely used in the industry and few scientific studies show whether modified hydrofluoric acid is actually safer.

**D.     The fire in the platinum reformer unit in March 2015**

34.     The February 2015 explosion also shot debris from the fluid catalytic cracking unit onto equipment in the adjacent platinum reformer unit, causing the equipment to leak a flammable fluid.

35.     Several weeks later, as Exxon workers were removing debris from the February 2015 explosion by cutting part of the electrostatic precipitator, sparks from the cutting ignited the flammable fluid in the platinum reformer unit. The fire burned for several hours on March 11, 2015.

**E.     The modified hydrofluoric acid leak in September 2015**

36.     On September 6, 2015, modified hydrofluoric acid in the alkylation unit leaked from a pipe clamp. Exxon had installed the clamp to patch an aging pipe instead of replacing it.

37.     Over five pounds of modified hydrofluoric acid was released as a white vapor cloud over the course of two hours.

**F.     The Board opens an investigation**

38.     As a result of the February 2015 explosion, the Board has opened an investigation under 42 U.S.C. § 7412(r)(6)(C)(i).

39.     Exxon has documents, information, and tangible evidence relevant to the Board's investigation.

**G.     The Board's subpoenas and Exxon's failure to comply fully**

40.     The Board issued seven administrative subpoenas to Exxon under 42 U.S.C. § 7412(r)(6) between June and October 2015 seeking evidence relevant to its investigation. Exxon has not fully complied with six of the seven subpoenas. Exxon's failure to provide the requested information has impeded and delayed the Board's investigation.

8

### 1.     The June 2015 subpoena

41.     On behalf of the Board, Western Regional Office Director Donald Holmstrom signed and issued a subpoena duces tecum to Exxon on June 29, 2015. The subpoena was issued under 42 U.S.C. § 7412(r)(6). The subpoena was personally served on Exxon's agent on June 30, 2015.

42.     The subpoena contained two document requests. Exxon has not fully complied with one of the document requests. In particular:

a.     Request number 1SUBDOC01 sought: "All risk assessments performed for the FCC unit, the alkylation unit, and the CO Boiler for the past fifteen years including but not limited to the Light Oils Risk Matrix or Light Oils Risk Portfolio for the last 10 years." These documents are relevant to the Board's investigation because they tend to show how Exxon identified hazards and what safeguards Exxon implemented to prevent incidents like the February 2015 explosion. Exxon has refused to produce any risk assessments for the alkylation unit. In addition, Exxon has refused to produce any ad hoc risk assessments for the FCC unit and CO boiler, although Exxon has allowed the Board's investigators to come to the refinery to review these ad hoc risk assessments. The investigators' review of these ad hoc risk assessments confirmed their relevance to the Board's investigation.

### 2.     The July 2015 subpoena

43.     Mr. Holmstrom, on behalf of the Board, signed and issued a subpoena duces tecum to Exxon on July 10, 2015. The subpoena was issued under 42 U.S.C. § 7412(r)(6). The subpoena was personally served on Exxon's agent on July 15, 2015.

44.     The subpoena contained seven document requests. Exxon has not fully complied with three of the requests. In particular:

a.     Request number 2SUBDOC02 sought: "Any and all documentation concerning the March 11, 2015 PTR fire incident including, but not limited to: reports, interviews, action items, recommendations, resolutions, attachments, notes, revisions, response efforts, progress reports, and log book entries." These documents are relevant

to the Board's investigation because they tend to show the cause of the March 2015 fire in the platinum reformer unit and its relationship to the February 2015 explosion. Exxon has refused to produce any documents responsive to this request.

b.    Request number 2SUBDOC03 sought: "Names of all personnel assigned to, working at, or responding to the PRT unit at the time of the March 11, 2015 fire." This information is relevant to the Board's investigation because these employees could have information about the cause of the March 2015 fire in the platinum reformer unit and its relationship to the February 2015 explosion. Exxon has refused to produce any documents responsive to this request.

c.    Request number 2SUBDOC04 sought: "Full and unredacted versions of the following documents: SOC Review – ESP Project (beginning at TORR-CSB-070305); SOC Minutes Friday, February 16, 2007 (beginning at TORR-CSB-070307); Torrance Refinery – 2015 TA Feasibility Study Peer Assist (beginning at TORR-CSB-065667); and Torrance Refinery – 2015 TA Feasibility Study Peer Assist Final – Rev 0 (beginning at TORR-CSB-065638)." These documents are studies about the feasibility of plans to maintain, repair, and replace the parts that failed and contributed to the February 2015 explosion. They are relevant to the Board's investigation because they tend to show the potential role of equipment failure and inadequate maintenance in causing or contributing to the February 2015 explosion. Exxon has not produced unredacted versions of the Torrance Refinery - 2015 TA Feasibility Study Peer Assist or Torrance Refinery - 2015 TA Feasibility Study Peer Assist Final - Rev 0.

### 3.    *The two August 2015 subpoenas*

45.    Mr. Holmstrom, on behalf of the Board, signed and issued a subpoena to Exxon on August 7, 2015. The subpoena was issued under 42 U.S.C. § 7412(r)(6). The subpoena was personally served on Exxon's agent on August 6, 2015.

46.    The subpoena contained two interrogatories. Exxon has not fully complied with one of the interrogatories. In particular:

a.    Request number 1SUBINT01 asked Exxon to: "Provide information

related to the vendors and manufacturers of the modified hydrofluoric acid used in the alkylation unit including a list of vendors, manufacturers, and quantity purchased annually, dates and contact information." These vendors and manufacturers likely have information about the risks associated with the modified hydrofluoric acid used in the alkylation unit. This information is relevant to the Board's investigation because it tends to show the potential consequences of a release of modified hydrofluoric acid, which nearly occurred in the February 2015 explosion. Exxon has not answered this interrogatory.

47.    Mr. Holmstrom, on behalf of the Board, signed and issued a subpoena duces tecum to Exxon on August 7, 2015. The subpoena was issued under 42 U.S.C. § 7412(r)(6). The subpoena was personally served on Exxon's agent on August 6, 2015.

48.    The subpoena contained 67 document requests. Exxon has not fully complied with 24 of the requests. In particular:

a.    Request number 3SUBDOC09 sought: "All documentation related to ExxonMobil's Global Reliability Equipment program. Include all documentation relating to the program for ExxonMobil corporate and the Torrance Refinery." The Global Reliability Equipment program instructs refineries on how to safely and reliably operate equipment. These documents are relevant to the Board's investigation because they tend to show the potential role of equipment failure and user error in causing or contributing to the February 2015 explosion. Exxon has not produced all documents responsive to this request.

b.    Request number 3SUBDOC10 sought: "All records relating to the evaluation of potential human health impacts of the spent catalyst material. Records include but are not limited to: epidemiologic (cohort, case control, cross sectional) or toxicological (dose response, toxicokinetics and toxicodynamics studies) studies conducted by ExxonMobil, ExxonMobil Contractors, or affiliated contracting research organization on behalf of ExxonMobil." The February 2015 explosion shot spent catalyst into the communities surrounding the refinery. These documents are relevant to the

11

Board's investigation because they tend to show the health risks and consequences from the February 2015 explosion. Exxon has not produced all documents responsive to this request.

c.      Request number 3SUBDOC11 sought: "All ExxonMobil records concerning the 1994 incident involving the accidental release of alkylation feed, including but not limited to, incident investigation reports, action items generated along with their ultimate disposition, and investigation team notes." Interviews during the Board's investigation revealed that a butane explosion occurred at Exxon's Torrance refinery in 1994. These documents about the 1994 incident are relevant to the Board's investigation because they tend to show the potential consequences of a release of modified hydrofluoric acid, which was nearly released in the February 2015 explosion. Exxon has not produced any documents responsive to this request.

d.      Request number 3SUBDOC13 sought: "All data, reports, and analysis received by ExxonMobil from Solomon Associates concerning the business unit containing the FCC from January 2008 to April 2015." Solomon Associates is a company that collects data from energy companies and provides participating companies with benchmarking information — that is, information about how the company compares with other energy companies in the industry on certain metrics, like operating costs, staffing levels, and output. The Board's investigation has shown that Exxon uses Solomon data in making maintenance decisions. These documents are relevant to the Board's investigation because they tend to show the potential role of cost-cutting measures in causing or contributing to the February 2015 explosion. Exxon has not produced any documents responsive to this request.

e.      Request number 3SUBDOC14 sought: "All data submitted by ExxonMobil to Solomon Associates concerning the business unit containing the FCC from January 2008 to April 2015." These documents are relevant to the Board's investigation because they tend to show the potential role of cost-cutting measures in causing or contributing to the February 2015 explosion. Exxon has not produced any

documents responsive to this request.

f.      Request number 3SUBDOC15 sought: "All documentation relating to the use of the Solomon Associates data and reports by ExxonMobil concerning the Torrance Refinery performance including but not limited to: plant goals, turnaround duration and expenditures, staffing, maintenance, capex, opex, benchmark analysis, employee and contractor compensation, business plans and goals, and personnel performance standards for the FCC process unit." These documents are relevant to the Board's investigation because they tend to show the potential role of cost-cutting measures in causing or contributing to the February 2015 explosion. Exxon has not produced any documents responsive to this request.

g.      Request number 3SUBDOC16 sought: "All AFPM reports generated as a result of the Torrance Refinery's PSM assessments for the last 5 years." American Fuel and Petrochemical Manufacturers (AFPM) is a trade organization that audits refineries for compliance with Occupational Safety and Health Administration (OSHA) regulations called process safety managements, or PSMs. These reports are relevant to the Board's investigation because they tend to show whether process safety management violations may have caused or contributed to the February 2015 explosion. Exxon has not produced any documents responsive to this request.

h.      Request number 3SUBDOC17 sought: "All documentation provided to the City of Torrance and the Torrance Fire Department by ExxonMobil concerning the Torrance Refinery's operations including but not limited to: incident data, reports, alky unit operation, and safety KPIs for the past 5 years." As part of the consent decree in the late 1980s resolving a nuisance suit filed by the City of Torrance, Exxon agreed to provide safety and operations information to the City of Torrance and the Torrance Fire Department. Safety KPIs, or key process indicators, are data about a particular physical condition (like temperature or pressure) at a given time. This information is relevant to the Board's investigation because it tends to show the integrity, security, and risks of the modified hydrofluoric acid used in the alkylation unit, which was nearly released in the

13

February 2015 explosion. Exxon has not produced any documents responsive to this request.

        i.      Request number 3SUBDOC18 sought: "All records related to the 1990 consent decree and any subsequent modifications between the city of Torrance and ExxonMobil related to the Torrance Refinery's use of hydrofluoric acid and the operation of the alkylation unit including but not limited to correspondence, subsequent consent decree amendments, revisions to decree requirements, the work of the safety advisor, investigations and recommendations from the City of Torrance, expert reports submitted, disputed enforcement matters, audits, safety advisor reports and recommendations, and reports of hazards or incidents since 1990.  Legal filings related to the 1990 consent decree must include but not be limited to: all records concerning a public nuisance suit filed by the City of Torrance against Mobil in April 1989." These records are relevant to the Board's investigation because they tend to show the integrity, security, and risks of the modified hydrofluoric acid used in the alkylation unit, which was nearly released in the February 2015 explosion, as well as the off-site consequences of a release. Exxon has not produced any documents responsive to this request.

        j.      Request number 3SUBDOC19 sought: "All studies, reports, analysis, data, experiments, modeling, technical analysis and specifications related to the same or similar modified hydrofluoric acid used in the alkylation unit at the time of the February 18 incident including but not limited to: records provided or shown to the City of Torrance or their representatives, ExxonMobil or third party records, records provided by the manufacturer or vendor, records relating to the documented or asserted degree of HF vapor suppression for modified HF, and industry and/or Mobil/ExxonMobil studies, experiments, modeling of modified HF and its effectiveness in suppressing vapor compared to unmodified HF." These records are relevant to the Board's investigation because they tend to show the integrity, security, and risks of the modified hydrofluoric acid used in the alkylation unit, which was nearly released in the February 2015 explosion. Exxon has not produced any documents responsive to this request.

k.      Request number 3SUBDOC20 sought: "All records related to the volume and concentration of hydrofluoric acid contained in each of the two alkylation unit HF acid settlers at the time of the February 18 incident." The HF acid settlers are the tanks containing modified hydrofluoric acid in the alkylation unit, one of which was nearly damaged in the February 2015 explosion. These records are relevant to the Board's investigation because they tend to show the potential consequences beyond the Torrance refinery of a release of modified hydrofluoric acid, which was nearly released in the February 2015 explosion. Exxon has not produced any documents responsive to this request.

l.      Request number 3SUBDOC29 sought: "The most recent report generated by the Safety Advisor regarding the consent decree between the City of Torrance and ExxonMobil Oil Corporation (Case No. C 719 953)." The Safety Advisor is the third party monitor appointed as part of the consent decree in the late 1980s resolving a nuisance suit filed by the City of Torrance against Exxon. This report is relevant to the Board's investigation because it tends to show the integrity, security, and risks of the modified hydrofluoric acid used in the alkylation unit, which was nearly released in the February 2015 explosion. Exxon has not produced any documents responsive to this request.

m.      Request number 3SUBDOC32 sought: "All Facility Siting/Building Studies conducted at the Torrance Refinery from 2000 to present. Documentation includes, but is not limited to, calculations, simulations, models, justifications, variance requests, preventative measures implemented, mitigative measures implemented, recommendations, resolutions, plot plans, and toxic, flammable, and explosive hazards identified." These documents show Exxon's assessment of risks and benefits from the physical layout of the refinery. They are relevant to the Board's investigation because they tend to show potential role of design failure in causing or contributing to the February 2015 explosion. Exxon has not produced all documents responsive to this request.

15

n.      Request number 3SUBDOC34 sought: "All documentation related to the impacts of potential toxic releases evaluated during Major Accident/Higher Level Risk Assessments." This documentation shows Exxon's analysis of the consequences of a major accident. It is relevant to the Board's investigation because it tends to show the adequacy of Exxon's safeguards against major accidents like an explosion causing a release of modified hydrofluoric acid, which was nearly released in the February 2015 explosion. Exxon has not produced all documents responsive to this request.

o.      Request number 3SUBDOC35 sought: "Document: EE.229E.2003." This document contains Exxon's safety considerations for the hazardous materials held throughout the refinery. It is relevant to the Board's investigation because it tends to show the adequacy of Exxon's safeguards for hazardous materials like modified hydrofluoric acid, which was nearly released in the February 2015 explosion. Exxon has not produced all documents responsive to this request.

p.      Request number 3SUBDOC37 sought: "All maps or plot plans generated to reflect the results of blast overpressure modeling, fire potential modeling, and toxic release modeling performed from 2000 to present. Include all respective calculations, recommendations, justifications, and resolutions." These documents contain Exxon's analysis about the possible extent and consequences of an explosion. They are relevant to the Board's investigation because they tend to show the potential role of inadequate safeguards against explosions in causing or contributing to the February 2015 explosion. Exxon has not produced all documents responsive to this request.

q.      Request number 3SUBDOC42 sought: "All documentation from 2000 to present relating to the Torrance Refinery's Risk Management Plan Worst Case Scenarios, including but not limited to, calculations, recommendations, preventative measures implemented, mitigative measures implemented, plot plans, simulations, and toxic, flammable, and explosive hazards identified." The U.S. Environmental Protection Agency's Risk Management Program requires refinery operators to develop risk management plans with worst-case scenarios. This documentation is relevant to the

16

Board's investigation because it tends to show the role of potential inadequacies in Exxon's risk management measures in causing or contributing to the February 2015 explosion. Exxon has not produced the calculations sought by this request.

r.     Request number 3SUBDOC43 sought: "All documentation identifying Alkylation and Platinum Reformer Unit siting hazards, risks, and safety concerns. Documentation includes calculations, recommendations, resolutions, preventative measures implemented, mitigate measures implemented, plot plans, simulations, and toxic, flammable, and explosive hazards identified." This documentation is relevant to the Board's investigation because it tends to show the adequacy of Exxon's management of siting risks in the alkylation unit and the platinum reformer unit, both of which were showered with debris in the February 2015 explosion, nearly leading to further incidents. Exxon has not produced any documents responsive to this request.

s.     Request number 3SUBDOC51 sought: "High resolution copy of TORR-CSB-002862. Include all related documentation associated with TORR-CSB-002862 including, but not limited to calculations, recommendations, resolutions, preventative measures implemented, mitigative measures implemented, plot plans, simulations, and toxic, flammable, and explosive hazards identified." This is a blast analysis document. This document and the supporting documentation and calculations sought are relevant to the Board's investigation because they tend to show the potential role of inadequate risk management in causing or contributing to the February 2015 explosion. Exxon has not produced the supporting documentation or calculations responsive to this request.

t.     Request number 3SUBDOC52 sought: "All Process Hazard Analyses (PHA) for the Alkylation and Platinum Reformer units." Process hazard analyses contain Exxon's analysis of how its systems in place can contain known risks. These documents are relevant to the Board's investigation because they tend to show the adequacy of Exxon's management of risks in the alkylation unit and the platinum reformer unit, both

17

of which were showered with debris in the February 2015 explosion, nearly leading to further incidents. Exxon has not produced any documents responsive to this request.

u.     Request number 3SUBDOC58 sought: "All maintenance records and work packages for FCC shut downs related to the spent catalyst slide valve, the 2K1 expander, the 2-port CO Boiler by-pass, and the 54" and 66" flue gas butterfly valves. Please provide documentation from 2005 to present." These documents show the maintenance history for the parts that failed and caused the February 2015 explosion. They are relevant to the Board's investigation because they tend to show the potential role of inadequate maintenance in causing or contributing to the February 2015 explosion. Exxon has not produced all documents responsive to this request.

v.     Request number 3SUBDOC60 sought: "All OIMS audits of the ExxonMobil Torrance refinery conducted by ExxonMobil or third party auditors for the last 10 years." These documents are internal audits of Exxon's Torrance refinery. They are relevant to the Board's investigation because they tend to show Exxon's awareness of problems that may have caused or contributed to the February 2015 explosion. Exxon has not produced the 2014 audit in response to this request.

w.     Request number 3SUBDOC63 sought: "All ExxonMobil minimum safe equipment specifications and operating requirements for FCC spent catalyst slide valve functionality and leakage rates for continued service or removal from operation." These documents list the thresholds for safe operation of the parts that failed and caused the February 2015 explosion. They are relevant to the Board's investigation because they tend to show the potential role of unsafe machinery operation in causing or contributing to the February 2015 explosion. Exxon has not produced all documents responsive to this request.

x.     Request number 3SUBDOC67 sought: "All documentation generated in creating the Risk Management Program off-site consequence analysis in the Exxon Torrance Refinery Risk Management Plan including, but not limited to: calculations, meeting minutes, notes, memorandums, reports, simulations, and analysis." This

18

documentation shows Exxon's analysis of off-site risks — risks the refinery poses to areas beyond the refinery. It is relevant to the Board's investigation because it tends to show potential inadequacies in Exxon's assessment of the risks posed by its refinery, as well as the potential consequences to the community of a hydrofluoric acid or catalyst dust release. Exxon has not produced all documents responsive to this request.

### 4.    *The September 2015 subpoena*

49.    Mr. Holmstrom, on behalf of the Board, signed and issued a subpoena duces tecum to Exxon on September 29, 2015. The subpoena was issued under 42 U.S.C. § 7412(r)(6). The subpoena was personally served on Exxon's agent on September 29, 2015.

50.    The subpoena contained 14 document requests. Exxon has not fully complied with any of the 14 requests. In particular:

a.    Request number 4SUBDOC01 sought: "All post-incident photos or videos of the damage resulting from the September 6, 2015 incident." This incident was a leak of modified hydrofluoric acid in the alkylation unit from a pipe clamp. These documents are relevant to the Board's investigation because they tend to show the risks of modified hydrofluoric acid, which was nearly released in the February 2015 explosion, as well as how modified hydrofluoric acid behaves when it leaks. Exxon has not produced any documents responsive to this request.

b.    Request number 4SUBDOC02 sought: "All surveillance video depicting the alkylation unit release on September 6, 2015." This video is relevant to the Board's investigation because it tends to show the risks posed by a release of modified hydrofluoric acid, which was nearly released in the February 2015 explosion, as well as how modified hydrofluoric acid behaves when it leaks. Exxon has not produced any documents responsive to this request.

c.    Request number 4SUBDOC03 sought: "Upon completion, provide the ExxonMobil Torrance Refinery Process Safety Management (PSM) internal investigation report resulting from the September 6, 2015 incident." Under OSHA

regulations called process safety managements, employers must complete an internal investigation report after a release of a hazardous substance. This report is relevant to the Board's investigation because it tends to show the adequacy of Exxon's safeguards for modified hydrofluoric acid, which was nearly released in the February 2015 explosion, as well as how modified hydrofluoric acid behaves when it leaks. Exxon has not produced any documents responsive to this request.

d.       Request number 4SUBDOC04 sought: "All Material Safety Data Sheet(s) for the chemical(s) released in the alkylation unit at the time of the September 6, 2015 incident." Material safety data sheets, also called safety data sheets, provide information about the safe use and hazards associated with a particular potentially harmful substance. These documents are relevant to the Board's investigation because they tend to show potential risks posed by modified hydrofluoric acid, which was nearly released in the February 2015 explosion. Exxon has not produced any documents responsive to this request.

e.       Request number 4SUBDOC05 sought: "All witness statements provided to ExxonMobil regarding the September 6, 2015 incident." This information is relevant to the Board's investigation because these witnesses could have information about the adequacy of Exxon's safeguards for modified hydrofluoric acid, which was nearly released in the February 2015 explosion, as well as how modified hydrofluoric acid behaves when it leaks. Exxon has not produced any documents responsive to this request.

f.       Request number 4SUBDOC06 sought: "All maintenance records, work orders, and work permits for the alkylation unit for the past year." These documents are relevant to the Board's investigation because they tend to show the adequacy of Exxon's safeguards for modified hydrofluoric acid, which was nearly released in the February 2015 explosion. Exxon has not produced any documents responsive to this request.

g.       Request number 4SUBDOC07 sought: "All piping and

instrumentation diagrams for the alkylation unit." These documents show how each piece of equipment in the alkylation unit is connected, as well as information like pipe specifications and the location of pressure and temperature gauges. This information is relevant to the Board's investigation because it tends to show the adequacy of Exxon's safeguards for modified hydrofluoric acid, which was nearly released in the February 2015 explosion. Exxon has not produced any documents responsive to this request.

h.     Request number 4SUBDOC08 sought: "All air monitoring and laboratory testing results from ambient air samples obtained from the September 6, 2015 incident. Provide results from September 6, 2015 through September 8, 2015. Include information on type, number, location, and time when ambient air samples were obtained." The refinery has air sensors that take ambient air samples. In addition, Exxon employees responding to the incident may have taken air samples. This information is relevant to the Board's investigation because it tends to show the adequacy of Exxon's safeguards for modified hydrofluoric acid, which was nearly released in the February 2015 explosion, as well as how modified hydrofluoric acid behaves when it leaks. Exxon has not produced any documents responsive to this request.

i.     Request number 4SUBDOC09 sought: "All management of change (MOC) documentation generated for the alkylation unit for the past year." Management of change documentation logs all equipment changes, like installing a clamp on a pipe. The September 2015 incident occurred when modified hydrofluoric acid in the alkylation unit leaked from a clamp that Exxon had installed to patch an aging pipe instead of replacing it. These documents are relevant to the Board's investigation because they tend to show the potential role of the failure of equipment safeguarding modified hydrofluoric acid, which was nearly released in the February 2015 explosion. Exxon has not produced any documents responsive to this request.

j.     Request number 4SUBDOC10 sought: "All records associated with the application and management of equipment engineered leak repair programs (e.g. clamps) including but not limited to: policies, procedures, workflow approval process,

21

pipe clamp MOC forms or procedures for installation, inspections, and removal of piping clamps for piping documentation." These records show Exxon's policies for using clamps to repair pipes. The September 2015 incident occurred when modified hydrofluoric acid in the alkylation unit leaked from a clamp that Exxon had installed to patch an aging pipe instead of replacing it. These documents are relevant to the Board's investigation because they tend to show the potential role of the failure of equipment safeguarding modified hydrofluoric acid, which was nearly released in the February 2015 explosion. Exxon has not produced any documents responsive to this request.

k.      Request number 4SUBDOC11 sought: "The operations manual for the alkylation unit." The operations manual provides guidance on running the alkylation unit. It includes temperatures and pressures that should not be exceeded, as well as information about how to respond when certain events occur. This document is relevant to the Board's investigation because it tends to show the adequacy of Exxon's safeguards against risks posed by the alkylation unit's modified hydrofluoric acid, which was nearly released in the February 2015 explosion. Exxon has not produced any documents responsive to this request.

l.      Request number 4SUBDOC12 sought: "All process flow diagrams, block diagrams, or simplified block diagrams for the alkylation unit." These documents show a map of the substances flowing into and out of the alkylation unit, as well as their temperatures and pressures. They are relevant to the Board's investigation because they tend to show the adequacy of Exxon's safeguards against risks posed by the alkylation unit's modified hydrofluoric acid, which was nearly released in the February 2015 explosion. Exxon has not produced any documents responsive to this request.

m.      Request number 4SUBDOC13 sought: "All radio transmission recordings concerning the September 6, 2015 incident. Provide recordings for 6 hours prior to the incident and 12 hours after the incident." Field operators at refineries often use radios to communicate with management. These transmissions are generally recorded and kept. They are relevant to the Board's investigation because they tend to

show the adequacy of Exxon's safeguards against risks posed by the alkylation unit's modified hydrofluoric acid, which was nearly released in the February 2015 explosion, as well as how modified hydrofluoric acid behaves when it leaks. Exxon has not produced any documents responsive to this request.

n.     Request number 4SUBDOC14 sought: "All documentation relating to the decision to not replace the clamp involved in the September 6, 2015 incident. Documentation includes but is not limited to: meeting minutes, notes, denied work requests, emails, presentations, recordings, slide decks, communications with governmental entities, and all associated attachments." The September 2015 incident occurred when modified hydrofluoric acid in the alkylation unit leaked from a clamp that Exxon had installed to patch an aging pipe instead of replacing it. These documents are relevant to the Board's investigation because they tend to show the potential role of the failure of equipment safeguarding modified hydrofluoric acid, which was nearly released in the February 2015 explosion. Exxon has not produced any documents responsive to this request.

### 5.     *The October 2015 subpoena*

51.     Mr. Holmstrom, on behalf of the Board, signed and issued a subpoena duces tecum to Exxon on October 30, 2015. The subpoena was issued under 42 U.S.C. § 7412(r)(6). The subpoena was personally served on Exxon's agent on October 30, 2015.

52.     The subpoena contained 55 document requests. Exxon has not fully complied with 13 of the requests. In particular:

a.     Request number 5SUBDOC5 sought: "Any Mechanical Integrity Recommendations, including resolutions, rationale for rejections or deferred for 2K1 Train, FCC Slide Valves, and the 8E-39 Reboilers." These documents are recommendations from Exxon's mechanical reliability group for the equipment that failed and contributed to the February 2015 explosion. They are relevant to the Board's investigation because they tend to show the potential role of equipment failure and

1    inadequate maintenance in causing or contributing to the February 2015 explosion.

2    Exxon has not produced all documents responsive to this request.

3              b.    Request number 5SUBDOC11 sought: "Provide the Public and

4    Government Affairs Integrated Strategic Communication Plan including all attachments

5    and referenced ExxonMobil standards and procedures." This document contains Exxon's

6    plan for public and governmental relations. It is relevant to the Board's investigation

7    because it tends to show the adequacy of the information Exxon provided to the public

8    after the February 2015 explosion. Exxon has not produced any documents responsive to

9    this request.

10             c.    Request number 5SUBDOC15 sought: "Provide the Best Practices in

11   External Affairs Guide used by the Torrance Refinery including all attachments and

12   referenced ExxonMobil standards and procedures." This document contains Exxon's

13   external affairs procedures. It is relevant to the Board's investigation because it tends to

14   show the adequacy of the information Exxon provided to the public and governmental

15   agencies after the February 2015 explosion. Exxon has not produced any documents

16   responsive to this request.

17             d.    Request number 5SUBDOC17 sought: "Provide all procedures listed

18   under the OIMS 10.1 Emergency Preparedness and Security including all attachments

19   and referenced ExxonMobil standards and procedures." These procedures address how

20   to respond to explosions, fires, terrorist incidents, and other emergencies. They are

21   relevant to the Board's investigation because they tend to show potential inadequacies in

22   Exxon's response procedures after the February 2015 explosion. Exxon has not produced

23   the procedures responsive to this request.

24             e.    Request number 5SUBDOC24 sought: "EE.70E.2000 'Comparison

25   of Knowledge Based and Delta HAZOP Procedures' including all attachments and

26   referenced ExxonMobil standards and procedures." A HAZOP is a means of analyzing

27   how well existing systems control known risks. These documents are relevant to the

28   Board's investigation because they tend to show the potential role of inadequate risk

management in causing or contributing to the February 2015 explosion. Exxon has not produced any documents responsive to this request.

f.      Request number 5SUBDOC28 sought: "Results from all IsoKinetic Testing completed on the Expander Since 2009." Isokinetic testing ensures that the expander turbine blades in the electrostatic precipitator are operating without wobbling. These documents are relevant to the Board's investigation because they tend to show the potential role of particulate matter build-up on the turbine blades in causing or contributing to the February 2015 explosion. Exxon has not produced all documents responsive to this request.

g.      Request number 5SUBDOC31 sought: "All cleaning, repair and replacement done on the 8-E39A/B reboilers over the last 10 years." These are the maintenance records for the parts that failed and caused the February 2015 explosion. They are relevant to the Board's investigation because they tend to show the potential role of equipment failure in causing or contributing to the February 2015 explosion. Exxon has not produced all documents responsive to this request.

h.      Request number 5SUBDOC38 sought: "The location, operational status, and maintenance records for ENS loudspeakers in and around the FCC and ESP." Emergency notification system (or ENS) loudspeakers communicate emergency messages to employees in a particular area of the refinery. These documents are relevant to the Board's investigation because they tend to show the adequacy of Exxon's safety provisions for employees, two of whom were injured in the February 2015 explosion. Exxon has not produced all documents responsive to this request.

i.      Request number 5SUBDOC44 sought: "EE.27E.84 'Guidelines for selection and installation of Emergency Block Valves' including all attachments and referenced ExxonMobil standards and procedures." This document contains guidelines for emergency block valves. It is relevant to the Board's investigation because it tends to show the potential role of inadequate risk management procedures and equipment failure in causing or contributing to the February 2015 explosion. Exxon has not produced all

1   documents responsive to this request.

2         j.      Request number 5SUBDOC45 sought: "All Scenario-Based

3   Operating Area Assessment Guide documentation for the FCC. Documentation also

4   includes but is not limited to: associated guidance." This document explains how Exxon

5   assesses hazards in operating areas and maintenance activities. It is relevant to the

6   Board's investigation because it tends to show the adequacy of Exxon's risk

7   management procedures and their potential role in causing or contributing to the

8   February 2015 explosion. Exxon has not produced all documents responsive to this

9   request.

10        k.      Request number 5SUBDOC46 sought: "All Site-Wide Risk

11  Assessments conducted for the Torrance Refinery from January 2008 to April 2015.

12  Documentation includes but is not limited to: associated guidance, meeting minutes,

13  notes, emails, presentations, recordings, slide decks, reports, action items, resolution of

14  said items, proposed abatement actions, and associated attachments." These documents

15  assess the most significant risks across the entire refinery as well as the adequacy of

16  safeguards in place to manage those risks. They are relevant to the Board's investigation

17  because they tend to show the adequacy of Exxon's risk management procedures and

18  their potential role in causing or contributing to the February 2015 explosion. Exxon has

19  not produced all documents responsive to this request.

20        l.      Request number 5SUBDOC47 sought: "All Tier 1 Best Practices

21  utilized by the Torrance Refinery." These documents are Exxon's procedures for

22  managing the most serious risks at the Torrance refinery. They are relevant to the

23  Board's investigation because they tend to show the potential role of inadequate risk

24  management in causing or contributing to the February 2015 explosion. Exxon has

25  produced a list of these practices but has not produced the actual practices.

26        m.      Request number 5SUBDOC54 sought: "ExxonMobil 'Risk Matrix

27  Application Guide' EE.43E.2011 including all attachments and referenced ExxonMobil

28  standards and procedures." This document contains Exxon's methodology for

26

performing risk assessments using matrices to measure different variables of a particular risk. It is relevant to the Board's investigation because it tends to show the adequacy of Exxon's risk management procedures and their potential role in causing or contributing to the February 2015 explosion. Exxon has not produced all documents responsive to this request.

### H. Efforts to seek compliance and obtain the required information

53. The United States has attempted to secure Exxon's compliance with the Board's subpoenas through reasonable, good-faith negotiations. These negotiations included numerous letters, phone calls, and in-person meetings between the Board and Exxon and Exxon's counsel.

54. In addition, when the Board had reason to believe that other parties besides Exxon might also have the information sought, the Board attempted to obtain the information from those other parties.

55. Finally, the United States Attorney's Office sent a demand letter to Exxon's counsel seeking full compliance on August 24, 2016.

56. Despite these efforts, Exxon has failed to fully comply with the Board's subpoenas.

## VI. Cause of Action

57. The United States restates the allegations in paragraphs 1–56 above and incorporates them by reference as if fully set forth in this paragraph.

58. This Court should enforce the Board's subpoenas because they are within the Board's mandate to investigate the facts, conditions, and circumstances and the cause or probable cause of any accidental release resulting in a fatality, serious injury, or substantial property damage.

59. The subpoenas are for a lawful and proper purpose and are within the Board's statutory authority. The information subpoenaed is relevant and necessary to the purpose for which it was subpoenaed. The subpoenas are reasonable and not overly broad or burdensome.

## VII.   Relief Requested

60.    The subpoenas are authorized and proper and entitled to summary enforcement by this Court. Accordingly, the United States respectfully requests this Court to:

        a.    order Exxon to produce all documents and written answers described in the subpoenas, or confirm in writing that no such documents exist, within 14 days after the order; and

        b.    grant the United States such other and further relief as the Court deems necessary and appropriate.

Dated: May 2, 2017                    Respectfully submitted,

SANDRA R. BROWN
Acting United States Attorney
DOROTHY A. SCHOUTEN
Assistant United States Attorney
Chief, Civil Division
ROBYN-MARIE LYON MONTELEONE
Assistant United States Attorney
Chief, General Civil Section

     */s/ Garrett Coyle*
GARRETT COYLE
Assistant United States Attorney

Attorneys for Petitioner United States of America

**Appendix of Relevant Statutes**

**42 U.S.C. § 7412(r)**

…

(6) Chemical Safety Board

    (A)    There is hereby established an independent safety board to be known as the Chemical Safety and Hazard Investigation Board.

    (B)    The Board shall consist of 5 members, including a Chairperson, who shall be appointed by the President, by and with the advice and consent of the Senate. Members of the Board shall be appointed on the basis of technical qualification, professional standing, and demonstrated knowledge in the fields of accident reconstruction, safety engineering, human factors, toxicology, or air pollution regulation. The terms of office of members of the Board shall be 5 years. Any member of the Board, including the Chairperson, may be removed for inefficiency, neglect of duty, or malfeasance in office. The Chairperson shall be the Chief Executive Officer of the Board and shall exercise the executive and administrative functions of the Board.

    (C)    The Board shall--

        (i)    investigate (or cause to be investigated), determine and report to the public in writing the facts, conditions, and circumstances and the cause or probable cause of any accidental release resulting in a fatality, serious injury or substantial property damages;

        (ii)    issue periodic reports to the Congress, Federal, State and local agencies, including the Environmental Protection Agency and the Occupational Safety and Health Administration, concerned with the safety of chemical production, processing, handling and storage, and other interested persons recommending measures to reduce the likelihood or the consequences of accidental releases and proposing corrective steps to make chemical production, processing, handling and storage as safe and free from risk of injury as is possible and may include in such reports proposed rules or orders which should be issued by the Administrator under the authority of this section or the Secretary of Labor under the Occupational Safety and Health Act to prevent or minimize the consequences of any release of substances that may cause death, injury or other serious adverse effects on human health or substantial property damage as the result of an accidental release; and

        (iii)    establish by regulation requirements binding on persons for reporting accidental releases into the ambient air subject to the Board's investigatory jurisdiction. …

1a

(D)   The Board may utilize the expertise and experience of other agencies.

(E)   The Board shall coordinate its activities with investigations and studies conducted by other agencies of the United States having a responsibility to protect public health and safety. … In no event shall the Board forego an investigation where an accidental release causes a fatality or serious injury among the general public, or had the potential to cause substantial property damage or a number of deaths or injuries among the general public.

(F)   The Board is authorized to conduct research and studies with respect to the potential for accidental releases, whether or not an accidental release has occurred, where there is evidence which indicates the presence of a potential hazard or hazards. To the extent practicable, the Board shall conduct such studies in cooperation with other Federal agencies having emergency response authorities, State and local governmental agencies and associations and organizations from the industrial, commercial, and nonprofit sectors.

(G)   No part of the conclusions, findings, or recommendations of the Board relating to any accidental release or the investigation thereof shall be admitted as evidence or used in any action or suit for damages arising out of any matter mentioned in such report.

…

(L)   The Board, or upon authority of the Board, any member thereof, any administrative law judge employed by or assigned to the Board, or any officer or employee duly designated by the Board, may for the purpose of carrying out duties authorized by subparagraph (C)--

    (i)   hold such hearings, sit and act at such times and places, administer such oaths, and require by subpoena or otherwise attendance and testimony of such witnesses and the production of evidence and may require by order that any person engaged in the production, processing, handling, or storage of extremely hazardous substances submit written reports and responses to requests and questions within such time and in such form as the Board may require; and

    (ii)   upon presenting appropriate credentials and a written notice of inspection authority, enter any property where an accidental release causing a fatality, serious injury or substantial property damage has occurred and do all things therein necessary for a proper investigation pursuant to subparagraph (C) and inspect at reasonable times records, files, papers, processes, controls, and facilities and take such samples as are relevant to such investigation.

1

2

3

Whenever the Administrator or the Board conducts an inspection of a facility pursuant to this subsection, employees and their representatives shall have the same rights to participate in such inspections as provided in the Occupational Safety and Health Act.

4

5

(M)     In addition to that described in subparagraph (L), the Board may use any information gathering authority of the Administrator under this chapter, including the subpoena power provided in section 7607(a)(1) of this title.

6

7

...

8

9

10

11

12

13

14

(O)     After the effective date of any reporting requirement promulgated pursuant to subparagraph (C)(iii) it shall be unlawful for any person to fail to report any release of any extremely hazardous substance as required by such subparagraph. The Administrator is authorized to enforce any regulation or requirements established by the Board pursuant to subparagraph (C)(iii) using the authorities of sections 7413 and 7414 of this title. Any request for information from the owner or operator of a stationary source made by the Board or by the Administrator under this section shall be treated, for purposes of sections 7413, 7414, 7416, 7420, 7603, 7604 and 7607 of this title and any other enforcement provisions of this chapter, as a request made by the Administrator under section 7414 of this title and may be enforced by the Chairperson of the Board or by the Administrator as provided in such section.

15

16

...

17

18

19

20

21

22

23

24

25

(Q)     Consistent with subsection (G) and section 7414(c) of this title any records, reports or information obtained by the Board shall be available to the Administrator, the Secretary of Labor, the Congress and the public, except that upon a showing satisfactory to the Board by any person that records, reports, or information, or particular part thereof (other than release or emissions data) to which the Board has access, if made public, is likely to cause substantial harm to the person's competitive position, the Board shall consider such record, report, or information or particular portion thereof confidential in accordance with section 1905 of Title 18, except that such record, report, or information may be disclosed to other officers, employees, and authorized representatives of the United States concerned with carrying out this chapter or when relevant under any proceeding under this chapter. This subparagraph does not constitute authority to withhold records, reports, or information from the Congress.

26

...

27

28

3a

**42 U.S.C. § 7607**

    (a)    Administrative subpenas; confidentiality; witnesses

In connection with any determination under section 7410(f) of this title, or for purposes of obtaining information under section 7521(b)(4) or 7545(c)(3) of this title, any investigation, monitoring, reporting requirement, entry, compliance inspection, or administrative enforcement proceeding under the chapter (including but not limited to section 7413, section 7414, section 7420, section 7429, section 7477, section 7524, section 7525, section 7542, section 7603, or section 7606 of this title)[,] the Administrator may issue subpenas for the attendance and testimony of witnesses and the production of relevant papers, books, and documents, and he may administer oaths. Except for emission data, upon a showing satisfactory to the Administrator by such owner or operator that such papers, books, documents, or information or particular part thereof, if made public, would divulge trade secrets or secret processes of such owner or operator, the Administrator shall consider such record, report, or information or particular portion thereof confidential in accordance with the purposes of section 1905 of Title 18, except that such paper, book, document, or information may be disclosed to other officers, employees, or authorized representatives of the United States concerned with carrying out this chapter, to persons carrying out the National Academy of Sciences' study and investigation provided for in section 7521(c) of this title, or when relevant in any proceeding under this chapter. Witnesses summoned shall be paid the same fees and mileage that are paid witnesses in the courts of the United States. In case of contumacy or refusal to obey a subpena served upon any person under this subparagraph, the district court of the United States for any district in which such person is found or resides or transacts business, upon application by the United States and after notice to such person, shall have jurisdiction to issue an order requiring such person to appear and give testimony before the Administrator to appear and produce papers, books, and documents before the Administrator, or both, and any failure to obey such order of the court may be punished by such court as a contempt thereof.

…